Opinion issued June 24, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-01041-CR

———————————

WilliAm Michael Proctor, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 248th District Court 

Harris County, Texas



Trial Court Case No. 1124360

 



 

O P I N I O N

            A jury convicted appellant, William Michael Proctor, of
capital murder.[1] The trial court
sentenced appellant to life in prison without parole.  In seven points of error, appellant contends
that: (1) the evidence was legally insufficient to support the verdict; (2) the
evidence was factually insufficient to support the verdict; (3) the trial court
erred in not granting his motion for a new trial; (4) the trial court erred in
not providing an in camera review on
his motion to require disclosure of the identify of an informant relating to a
Crime Stoppers tip; (5) the trial court erred in admitting a suggestive photo
array shown to two witnesses; (6) the trial court improperly admitted hearsay
evidence during the direct examination of Detective M. Miller; and (7) he
received ineffective assistance of counsel.

          We
affirm.

BACKGROUND

          The
complainant, Rosendo Rios, owned the El Ranchito nightclub in southwest
Houston.  On the night of June 10, 2007,
two men entered Rios’s bar, one man, appellant, was a tall white man and the
other was an African-American.  The men
had visited the bar individually on the Friday and Saturday nights before the
murder.  On the night of June 10, the two
men entered and exited the bar numerous times, but were on the property for
around two hours.  After having been at
the bar for nearly two hours, appellant and his co-conspirator exited the bar,
approached a taco stand, and appellant committed two robberies at
gunpoint.  As these robberies occurred,
Rios’s employee in the taco stand used a special signal that alerted him,
through security cameras, that something was wrong.  Rios left his office, went out the back door
of the bar, and walked towards the taco stand. 
As appellant completed the robberies, his co-conspirator entered the
taco stand and took approximately $140 from the register.  Appellant approached the front of the taco
stand and fired his gun, killing Rios. 
After appellant shot Rios, he attempted to enter the taco stand, but his
co-conspirator restrained him, and the two ran to a car and fled.

          Police
officers arrived seven minutes later. 
Detectives M. Miller and A. Belk, of the Houston Police Department, were
assigned to the case.

          The
two principal witnesses, Alma Urbina, the employee in the taco stand, and Irma
Ibarra, a bartender, described appellant to the detectives.  The detectives established a third party as a
potential suspect, and put a photo of him into a photo array that they showed
to Urbina.  Urbina could not identify
anyone in the array as the shooter.  

On June 25, the detectives had
Urbina and Ibarra describe appellant to a police sketch artist, who produced a
sketch.   Officials from the police
department also contacted Schepps Dairy, a subsidiary of Dean Foods, a public
corporation that financially supports Crime Stoppers.  Schepps volunteered a $5,000 reward for
anyone who would provide the police department with information on the
shooting.  The police publicized the
sketch and the reward in the local media on June 25, 2007.  On June 26, the police received a tip
indicating that the killer lived at 2530 Copper Valley, in Houston, Texas.

The detectives went to the address
provided by the tipster and spoke with an African-American woman, Carolee
Proctor.  After denying that a white male
lived in the apartment, Proctor invited the detectives inside.  While in the apartment, the detectives saw a
photograph of Proctor and appellant hugging. 
Proctor admitted to the detectives that she was married to appellant,
but told the detectives that he was in Louisiana with his sister and that she
did not know his cell phone number.  
Approximately fifteen minutes after the detectives left Proctor’s
apartment, appellant called them.  He
told Detective Belk that he was in Louisiana and implied that he had been in
Louisiana when the murder occurred.

On July 5, appellant consented to
come to the police station to speak with the officers.  While he was in the police station, the
officers took photos of appellant’s face and his tattoos.  The detectives put appellant’s photo into a
new photo array, and Detective Miller showed that array to Urbina and Ibarra,
both of whom identified appellant as the shooter.  Detective Miller asked the complainant’s
brother, Leroy Rios, to translate for him when he showed the photo array to
Ibarra and Urbina.  The complainant’s
widow was also present for both identifications.

          The
State obtained an indictment against appellant for capital murder alleging that
appellant killed Rios with a gun while attempting to rob Alma Urbina.   On July 11, 2007 the police arrested
appellant.  Following his arrest,
appellant was placed in an area of the jail that also housed an acquaintance of
his, Joseph Adams.  

          Before
trial, appellant filed a motion to discover the identity of the person who
provided the tip in which the police learned appellant’s address.  Appellant claimed that Schepps was not a
Crime Stoppers organization, so that information provided to it was not privileged,
and that the identity of the person who provided the tip was exculpatory and
thus he was entitled to it.  He requested
a hearing and in camera review of the
information in the Crime Stopper’s tip.  
Schepps and the State filed motions to quash.  The trial court held a hearing in which
appellant’s counsel claimed he believed the information was exculpatory because
appellant was being “set up.”  The trial
court granted the motion to quash without conducting an in camera review.

Prior to trial, appellant also
filed a motion to suppress the photographic identification based on Urbina’s
and Ibarra’s identification of appellant from the photo array.  The trial court carried the motion with the
trial.  During trial, the trial court
held hearings on the photo array outside of the presence of the jury.  It found Detective Miller and Ibarra credible
and allowed them to testify about the photo array and to identify appellant in
court.  The trial court did not enter
findings on Urbina’s credibility, but it allowed her to testify to the photo
array and to identify appellant in court.

          At
trial, the State called twelve witnesses and the defense called nine.  The State first called Ibarra. She testified
that on the night of the murder she was working as a bartender in Rios’s
bar.  Appellant and an African-American
man had been in the bar and were drinking Corona beer.  They were conspicuous because the
overwhelming percentage of the bar’s patrons were Hispanic, and, on the night
of the murder, the bar had only about fifty customers in it.  Appellant and the African-American man played
pool intermittently for almost two hours, beginning around ten or eleven at
night.  Appellant came up to Ibarra’s bar
asking for change, and he and the other man went in and out of the bar several
times.  Ibarra testified that she got a
“good look” at appellant.  Around 1:00
a.m., a fight broke out, and Ibarra went into Rios’s office to get him, but he
was not there.  Approximately five
minutes later, she heard a sound “like when somebody steps [on a can],” and
went to the front of the bar, where she saw Rios “laid out,” bleeding, and
trying to speak.  Ibarra held him and
told him to be quiet.  Although he continued
to speak, she could not understand him. 
Ibarra called 911.

          At
the hospital, Ibarra spoke with police officers and told them that the shooter
had a big tattoo on his left arm, a large tattoo on his neck, light colored
eyes, an earring, and a small mustache.[2]  Over objection from defense counsel, she
identified appellant in the photo array that Detective Miller presented to
her.  She then identified appellant in
the courtroom.

          The
State next called Urbina.  Urbina
testified that she was working in the taco stand on the night of the
murder.  She testified that Rios had
recently installed a security camera in the taco stand that did not record, but
that allowed him to observe the taco stand from his office.  Rios instructed Urbina that if there was a
problem she should put a jar in front of the camera so that he would be alerted
and could come assist her.    

On the night of the murder, Urbina
saw appellant and an African-American man enter and exit the bar several
times.  She testified that she had not
seen them at the bar the night before, but that she had seen the African-American
man at the bar two nights before the murder. 
The area outside of the bar was well lit, and she testified that she
could see them clearly as they entered and exited.  She witnessed appellant rob a man, and then
she watched as he robbed another man who had come to help the first
victim.  She testified that appellant
robbed them both at gunpoint.  The
African-American man did not have a weapon.

As appellant robbed the two men,
Urbina moved her jar to indicate to Rios that something was wrong, and she then
attempted to call Rios.  While she was on
the phone trying to reach Rios, the African-American man who had been with
appellant entered the taco stand, demanded money, and then took approximately
$140 from the till.  She never saw him
with a weapon.  She saw appellant shoot
the gun, attempt to enter the taco stand, be restrained by the African-American
man, and then flee in a dark colored car with four doors.  She found Rios lying in blood between a row
of cars and his bar.

          Urbina
described the shooter to the police as approximately six feet four inches tall,
between 150 and 160 pounds in weight, 25-30 years old, and having a shaved
head, a small amount of light colored hair, a small moustache, a light beard
and a tattoo on the back of his neck that looked like wings.  She identified appellant in the second photo
array that Detective Miller presented to her, and she identified appellant in
court.

          The
State then called Leroy Rios.  Rios
testified that he first met Ibarra and Urbina on the night of the murder and
that Detective Miller later asked him to translate for him when he presented
the photo array to Ibarra and Urbina.  He
testified that he and Rios’s widow followed Detective Miller to Urbina’s house,
where he translated as Detective Miller showed Urbina the photo array.  After Ubrina identified appellant in the
photo array, Detective Miller, followed by Leroy Rios and the complainant’s
widow, went to Ibarra’s house.  Rios’s
wife was present when Urbina and Ibarra viewed the photo array.  Leroy Rios testified that Urbina and Ibarra
both identified appellant.

          The
State then called Detective Miller.  He
testified that, on June 12, 2007, he showed a photo array to Urbina that
contained a picture of the first suspect in the case.  Urbina could not identify anyone in the photo
array.  The day after a Crime Stoppers
reward was publicized, the police received a tip that the shooter lived at 2530
Copper Valley, but the tip included no additional information.  The following day, he and his partner went to
that address and encountered Carolee Proctor. 
Detective Miller testified over appellant’s hearsay objections to
statements made to his partner and him by Carolee Proctor.  Following that interview, he had a new photo
array made that included a photograph of appellant, and he asked Leroy Rios to
help him locate Urbina and Ibarra and to accompany him to translate as they
viewed the new photo array.  Detective
Miller identified appellant in court, but testified that appellant had gained
between 50 and 60 pounds since his arrest. 


Detective Miller also testified
that he requested appellant’s cell phone records from AT&T on September 5,
2007.  The records showed that
appellant’s phone was used in Houston on the day of the murder, but that no calls
were made or received from approximately 9:30 p.m. on the night of the murder
until approximately 9:30 a.m. on the morning after the murder.  The records also showed that appellant’s
phone was used in Louisiana on June 12, 2007.

          Joseph
Adams, who was incarcerated in the Harris County jail awaiting trial, testified
that he approached appellant in jail because he recognized him from the Acres
Homes subdivision in Houston.  He
testified that this is a predominantly African-American section of Houston, but
that appellant was seen there frequently and was referred to as “White
Mike.”  He testified that he saw
appellant “in the streets, [and at] dog fights.”  Appellant told him that he had been arrested
for a “BS capital murder.”  Appellant
indicated that he had been charged with capital murder because, while he was in
a bar, he began to argue with a woman; he and his friend were escorted from the
club; and he went to get his pistol and “took care of business.”  Adams then testified that while he was in
jail he heard appellant on the phone and heard him tell the other person, “Just
tell your uncle I left the phone in the truck.” 
He also testified that appellant sought to get tattoos while in jail to
alter his appearance.  Defense counsel
did not cross-examine Adams.

          The
State then called Dr. Albert Chu, an assistant medical examiner for Harris
County, who testified that a gunshot to the head killed Rios.  The defense did not cross-examine Dr. Chu.

          As
its first witness, the defense called Dr. Frank Barnes, an orthopedic
surgeon.  Dr. Barnes testified that
appellant had surgery on his ankle on April 23, 2007 and that it would have
been unlikely, but possible, that appellant could have run six weeks after the
surgery without pain or a limp.

          The
defense then called Carolee Proctor.  She
testified that on the night of the murder, around 10:00 p.m., she, appellant,
and Salvador Hernandez were in a pizza restaurant.  On cross-examination she admitted that her
previous statement in an affidavit indicating that appellant was in Louisiana
on the night of the murder was not truthful. 
The defense also called Hernandez, a friend of appellant’s, who
testified that appellant and Carolee Proctor were with him at the pizza
restaurant on the night of the murder.   

The defense then called Ernesto
Rojas, a licensed computer forensic investigator.  Rojas testified that on June 10, 2007
appellant’s phone was used around his apartment in Houston, but the last call
was at 9:47 p.m. on the night of the murder. 
Nothing in the cell phone records indicated that the phone was used in
or near Louisiana on the night of the murder.

Finally, the defense called
Labertha Dunbar, appellant’s mother-in-law. 
She testified that appellant had gained weight since his wedding on May
19, 2007, but that otherwise his appearance had not changed significantly since
the wedding.   She testified that
appellant was in Houston on the night of the murder.   

The jury was instructed on the law
of parties and convicted appellant of capital murder.  The trial court sentenced him to life in
prison without parole. 

Appellant filed a motion for new
trial on January 16, 2009, claiming that a juror took notes and that the notes
were considered during deliberations. 
The trial court did not rule on appellant’s motion for new trial, and it
was overruled by operation of law. 

CRIME STOPPERS’ PRIVILEGE 

In his fourth issue, appellant
contends the trial court erred in holding that the “crime stoppers” privilege
applied to prevent disclosure of the documents related to the identity of the
informant who provided the police with appellant’s address and in failing to
conduct an in camera review of the
information provided.  

Appellant filed two
motions and a subpoena duces tecum requesting the disclosure of all information
obtained by the police from the crime stopper’s tip, arguing that this tip
might contain exculpatory information. 
Specifically, appellant asked for the trial court “to require the state
to provide the defendant with any information regarding the defendant obtained
by the police through the ‘Crime Stoppers’ Program . . . .”  On August 18, 2008, he filed a second motion
in which he asked the court “to instruct the prosecution and Crime Stoppers
organizations to reveal the true name and present addressees of all informers
and all reports of communications regarding the homicide of Mr. Resendo Rios on
the 11th day of June 2008 . . . .” 
Appellant also attached a subpoena duces tecum for Schepps demanding all
information related to the payment of money for a crime stoppers tip.  Schepps and the State both filed motions to
quash appellant’s motions for disclosure and his subpoena duces tecum.  

The trial court held a
hearing on the motions to quash.  After
determining that Schepps was a crime stoppers organization, the trial court
granted the State’s and Schepps’ motion to quash appellant’s request for
disclosure of the identity of the informant. 
Appellant then asked for an oral amendment to his motion for disclosure
so that the trial court could review the documents in camera to determine whether the material was potentially
exculpatory.  The court granted
appellant’s request to amend his motion, and then held a hearing on the
record.  At the hearing, defense counsel
argued for in camera review of the
evidence to determine if it was exculpatory on the ground that he believed the
tip was provided by “the individual who was involved in the actual homicide or
somebody who’s just being vengeful about [appellant] because of some issues
between them . . . .”  The trial court denied
the motion to quash without conducting an in
camera review of the crime stoppers records.

1.     Applicability of Crime Stoppers
Privilege

          Appellant first argues in his fourth
issue that Schepps’ rewards program is not a crime stopper’s organization, as required
for the crime stoppers privilege to apply. 

          Evidence
of a communication between a person submitting a tip to a crime stoppers
organization is not admissible in a court proceeding except as provided by
statute.  See Tex. Gov’t Code Ann.
§ 414.008(a) (Vernon
2005).  In relevant part, Section 414.008 of the Government
Code provides: 

(a) except as otherwise provided by this section,
evidence of a communication between a person submitting a report of a criminal
act to the council or a crime stoppers organization and the person who accepted
the report on behalf of the council or organization is not admissible in a
court or an administrative proceeding.

 

(b) records of the council or a crime stoppers
organization concerning a report of criminal activity may not be compelled to
be produced before a court or other tribunal except on a motion:

 

(1) filed in a criminal trial court by a defendant who
alleges that the records or report contains evidence that is exculpatory to the
defendant in the trial of that offense;

. . . .

 

(c) on motion of a movant under Subsection (b), the
court may subpoena the records or report. The court shall conduct an in camera
inspection of materials produced under subpoena to determine whether the
materials contain:

 

(1) evidence that is exculpatory to the defendant . .
. .

 

Id. § 414.008 (a)-(c)(1).  

Section 414.001(2) of the Government Code defines a “crime stoppers
organization” as:

(A) a private, nonprofit
organization that is operated on a local or statewide level, that accepts and
expends donations for rewards to persons who report to the organization
information about criminal activity and that forwards the information to the
appropriate law enforcement agency; or

 

(B)  a public organization that is operated on a
local or statewide level, that pays rewards to persons who report to the
organization information about criminal activity, and that forwards the
information to the appropriate law enforcement agency.

 

Id. § 414.001(2)(A)–(B).  The
statute does not define “public organization.”

          Schepps
is a wholly owned subsidiary of Dean Foods, a publically owned
corporation.  Ed Spencer, the
administrator of Schepps’ crime stoppers rewards program, testified at the
hearing on the State’s and Schepps’ motions to quash the subpoena of Schepps’
crime stoppers records.  Spencer
testified that Schepps started its rewards program as a component of its
philanthropic endeavors to help provide justice and relief to the victims of
certain violent crimes after one of its milkmen was killed in the early
1970’s.  After Schepps was acquired by
Dean Foods, the program was extended to other dairies and other states, but it
continues to operate through Schepps in Houston, Dallas, and Fort Worth, Texas.  The program provides money to persons who
supply law enforcement officials with information concerning selected
crimes.  

Spencer testified that
the Schepps crime stopppers organization is independent of the Harris County
Crime Stoppers program but that the two often coordinate efforts.   Sometimes Schepps decides to post an award
and contacts local law enforcement agencies; sometimes, as here, it is
contacted by a law enforcement agency and asked to post a reward for
information leading to an arrest. 
Schepps does not operate a tip line of its own; rather, its reward
announcements instruct persons offering tips to contact the law enforcement
agency with which it is coordinating its efforts.  Schepps generally offers a $10,000 reward,
but when, as here, two persons are involved in a crime, it offers $5,000 for
information leading to each arrest.  The
rewards program is financed by the individual dairies, and the money for it
comes out of the dairies’ operating budgets.

We conclude that,
although Schepps is a for-profit organization and a subsidiary of a public
corporation, its rewards program is a private non-profit organization that
accepts funds contributed from Schepps’ income and expends donations for
rewards to persons who report to the appropriate law enforcement agency.  We thus conclude that the crime stoppers
rewards program in which Schepps participates qualifies as a crime stoppers
organization within the scope of section 414.001(2)(A) of the Government
Code.  See id. § 414.001(2)(A) (providing definition for “crime
stoppers organization”); In re Hinterlong,
109 S.W.3d 611, 622–23 (Tex. App.—Fort Worth 2003, no pet.) (holding that trial
court did not abuse its discretion in holding that program at public high
school which encouraged students to report crime and was affiliated with
Tarrant County Crime Stoppers was “crime stoppers organization”).  Therefore, we hold that the trial court did
not abuse its discretion in holding that the crime stoppers privilege applied
to the records and reports concerning the informant in this case.      

We overrule the first
part of appellant’s fourth issue.

2.    
Denial of Request for In camera Inspection

Appellant also argues in his fourth issue that the
trial court erred in failing to conduct an in
camera review of the records and reports related to the tip as to
appellant’s address given by the informant in response to Schepps’ reward
offer.

The prosecution has an affirmative
duty to disclose all material evidence favorable to the defense. McFarland v. State, 928 S.W.2d 482, 511
(Tex. Crim. App. 1996). Under the “Brady
rule,” the prosecution of a defendant violates due process when the State
suppresses evidence in its possession that is favorable to an accused “[w]here
the evidence is material either to guilt or to punishment irrespective of the
good faith or bad faith of the prosecution.” 
Wyatt v. State, 23 S.W.3d 18,
27 (Tex. Crim. App. 2000) (citing Brady
v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1197).  “Brady
has been extended to include the required revelation to an accused of material
exculpatory evidence in the possession of police agencies and other parts of
the ‘prosecutorial team.’” Ex  parte Mitchell, 977 S.W.2d 575, 578 (Tex.
Crim. App. 1997) (citing Kyles v. Whitley,
514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)).  “Evidence withheld by a prosecutor is
‘material’ if there is ‘a reasonable probability that, had the evidence been
disclosed to the defense, the outcome of the proceeding would have been
different.’” Wyatt, 23 S.W.3d at 27
(quoting United States v. Bagley, 473
U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985)).  
Thus, a due process violation occurs “if a prosecutor: (1) fails to
disclose evidence, (2) favorable to the accused, (3) which creates a
probability of a different outcome.”  Id. (citing Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992)).  

The crime stoppers privilege statute provides that a trial
court may subpoena the records of a crime stoppers organization concerning a
report of criminal activity on the motion of a defendant who alleges that the
records or report contain evidence exculpatory to him, and, if it does so, it
must conduct an in camera inspection
of the records subpoenaed.  Tex. Gov’t Code Ann. §
414.008(b)-(c).  However, the trial court
is not required to subpoena the records merely at the defendant’s request.   See
Tex.
Gov’t Code Ann. §
311.016(1) (providing
that term “may” “creates discretionary authority or grants permission or
power”).  Rather, the defendant must make a plausible showing to the trial court, through
sworn evidence or agreed facts, that the crime stoppers records in the
possession of the State would be material exculpatory evidence that would
create a probability of a different outcome. 
See Wyatt 23 S.W.3d at 27; Mitchell, 977 S.W.2d at 578.  If such a showing is made and the trial
court, in the exercise of its discretion, subpoenas the crime stoppers records,
it must then conduct an in camera
inspection of the subpoenaed documents to determine if the produced information
contains Brady evidence.  An in
camera inspection satisfies both the defendant’s interest in the production
of crime stoppers information that may be exculpatory and the State’s interest
in fostering law enforcement by protecting the identity of the crime stoppers
informants.  Thomas v. State, 837 S.W.2d 106, 113–14 (Tex. Crim. App. 1992).  

Here,
appellant made no showing to the trial court that the crime
stoppers report would be either exculpatory or material or that it would create
the probability of a different outcome under the circumstances of this case and
would therefore have served appellant’s due process interest in the production
of exculpatory information.  See Mitchell, 977 S.W.2d at 578.  The subpoena of the crime stoppers report
under these circumstances could only have undermined the State’s compelling
interest in furthering law enforcement by intimidating informants from coming
forward with information as to where an accused could be found.  See
Thomas, 837 S.W.2d at 114 (holding that allowing unrestricted access to
crime stoppers information could compromise State’s efforts to protect identity
of crime stoppers informants).  We hold
that the trial court was not required to subpoena the crime stoppers records in
this case, and thus it did not abuse its discretion in not conducting an in camera review of the information in
the crime stoppers tip.[3]

          We overrule appellant’s fourth issue.



The discussion of the remaining
points of error does not meet the criteria for publication, Tex. R. App. P. 47, and is thus ordered
not published.

We affirm the judgment of the
trial court.



 

LEGAL AND FACTUAL SUFFICIENCY

In his first and second issues,
appellant contends that the evidence supporting the jury’s verdict was legally
and factually insufficient to identify him as the perpetrator and that the
evidence established that he could not have committed the murder because he was
somewhere else when it occurred.  He
contends that the witnesses’ descriptions of him did not match his physical
characteristics, a “jail house snitch” is an unreliable witness, appellant’s
“family members and close friend” testified that he was not in the vicinity of
the murder scene when the murder occurred, and surgery he had on his ankle six
to eight weeks before would have prevented him from committing the murder. 


“A person commits capital murder if
he . . . intentionally commits . . . murder in the course of committing or
attempting to commit . . . robbery. . . .” 
Tex. Penal Code Ann. § 19.03(a)(2) (Vernon 2003).  

A.              
Legal Sufficiency

In a legal sufficiency review, we
consider the entire trial record to determine whether, viewing the evidence in
the light most favorable to the verdict, a rational jury could have found the
accused guilty of all essential elements of the offense beyond a reasonable doubt.  See
Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); Vodochodsky v. State, 158 S.W.3d 502,
509 (Tex. Crim. App. 2005).  The jurors
are the exclusive judges of the facts, the credibility of the witnesses, and
the weight given to the testimony.  Margraves v. State, 34 S.W.3d 912, 919
(Tex. Crim. App. 2000).  A jury is
entitled to accept one version of the facts and reject another, or reject any
part of a witness’s testimony.  Id. 
In conducting our review of the legal sufficiency of the evidence, we do
not reevaluate the weight and credibility of the evidence, but ensure only that
the jury reached a rational decision.  Muniz v. State, 851 S.W.2d 238, 246
(Tex. Crim. App. 1993).

It is well established that the
testimony of a single eyewitness may be legally sufficient to support
conviction.  Davis v. State, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.]
2005, no pet.) (citing Aguilar v. State,
468 S.W.2d 75, 77 (Tex. Crim. App. 1971)). 


Here, Urbina testified that with
the assistance of good lighting she saw appellant rob two patrons with a
gun.  She signaled to Rios for
assistance.  Afterwards, she saw
appellant fire his gun and saw the African-American man take money from the
trailer.  Appellant attempted to enter
the trailer, but his co-conspirator restrained him.  Urbina was afraid for her life.  Appellant and the African-American man fled
together, and she subsequently found Rios on the ground.  Ibarra also identified appellant and
testified to his presence in the bar on the night of the shooting.  Viewing the evidence in the light most
favorable to the verdict, we hold that the jury could have found beyond a
reasonable doubt that appellant intentionally committed the murder of Rios in
the course of committing robbery.  See Davis, 177 S.W.3d at 359 (holding
that testimony by one eyewitness can be legally sufficient).

B.   Factual Sufficiency

When conducting a factual
sufficiency review, we view all of the evidence in a neutral light.  Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We will set the verdict
aside only if (1) the evidence is so weak that the verdict is clearly wrong and
manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000). Under the first prong of Johnson,
we cannot conclude that a conviction is “clearly wrong” or “manifestly unjust”
simply because, on the evidence before us, we would have voted to acquit had we
been on the jury. Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006). 
Before determining that evidence is factually insufficient to support a
verdict under the second prong of Johnson,
we must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts the jury’s verdict. Id. 
The jury is in the best position to evaluate the credibility of
witnesses, and we are required in our factual sufficiency review to afford “due
deference” to the jury’s determinations. 
Marshall v. State, 210 S.W.3d
618, 625 (Tex. Crim. App. 2006).  In
conducting a factual sufficiency review, we must also discuss the evidence
that, according to the appellant, most undermines the jury’s verdict.  See
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  We cannot declare that a conflict in the
evidence justifies a new trial simply because we disagree with the jury’s
resolution of that conflict.  Watson, 204 S.W.3d at 417.

Here, appellant argues that the
descriptions provided by Urbina and Ibarra to the police officers were
inconsistent with appellant’s physical features.  Appellant contends the witnesses testified that the shooter
had a pointed nose but that his nose is not pointed, that the shooter had blue
eyes but he has greenish-brown eyes, and the like.  However, appellant does not direct us to
portions of the record that contradict the descriptions provided by Ibarra and
Urbina.  Appellant also argues that when Urbina viewed the first photo array she
could not identify anyone in the array as the shooter.  However, the testimony established that
appellant’s photo was not in the first array. 
Furthermore, both witnesses identified appellant in a photo array
presented to them several weeks after the murder, and they identified appellant
in court.  Lastly, the State produced
evidence that indicated that appellant altered his appearance while awaiting
trial by adding tattoos and as much as 50 to 60 pounds in weight.  

Appellant also argues that the
evidence is factually insufficient because his alibi witnesses testified either
that he was not in Texas on the night of the killing or that he was not in the
part of Houston where the killing occurred. 
Labertha Dunbar, appellant’s mother-in-law and Carolee Proctor, his
wife, provided affidavits swearing he was in Louisiana on the night of the
killings.  However, when this testimony
was controverted with records from appellant’s cell phone carrier, these
witnesses recanted their affidavits. 
Beverly Harris testified that on June 10, 2007, appellant picked her up
at 7:00 a.m., drove her to the Newton County Jail to see her son, Alonzo
Harris, and that, after spending two and a half hours with her son, she and
appellant returned to Houston. 
Appellant’s wife testified that after appellant returned from Newton
County she, appellant, and Salvador Hernandez went to a restaurant in Houston
where they remained from 10:00 p.m. until “very late.”  

Hernandez testified that he was
with appellant and his wife at the restaurant until it closed at midnight on
the night of the killing.  However,
through the testimony of Joseph Adams, the State rebutted this alibi testimony
by producing a witness who testified that appellant admitted to “taking care of
business” with his pistol, by committing the robbery and the murder.  Appellant contends that Adams’ testimony is
not credible.  However, the State also
produced Urbina and Ibarra, who testified that appellant was in the bar on the
night of the killing.  

Lastly, appellant contends that the
evidence was factually insufficient because the injury to his foot would have
prevented him from committing the crime and fleeing from it. However, the State
produced evidence, through appellant’s own witness, that, despite appellant’s
injury and recent surgery, it would have been possible for him to have
committed the offense and to have fled the scene on foot. 

In a determination of factual
sufficiency, the jury is in the best position to evaluate the credibility of
witnesses, and we afford “due deference” to the jury’s determination.  Marshall,
210 S.W.3d at 625. Therefore, to the extent there are inconsistencies in the
testimony of the witnesses, we defer to the jury to decide credibility.   See
Petro v. State, 176 S.W.3d 407, 412 (Tex. App.—Houston [1st Dist.] 2004,
pet. ref’d) (holding any discrepancies in description of robber and manner of
witnesses’ in-court and out-of-court identifications are matters best left for
jury’s evaluation of credibility and demeanor of witnesses who appeared before
them).  Here, in evaluating all of the
evidence in a neutral light, we cannot say that the evidence is so weak that
the verdict is clearly wrong and manifestly unjust or that the verdict is
against the clear weight and preponderance of the evidence.  See
Johnson, 23 S.W.3d at 11.  We hold
that the evidence is factually sufficient to sustain appellant’s
conviction.  

We overrule appellant’s first and
second issues.

FAILURE TO GRANT A NEW TRIAL

           In his third issue, appellant contends that
the trial court abused its discretion in denying his motion for a new trial.

          Appellant
filed a motion for a new trial on January 16, 2009, claiming that a juror took
notes during the trial, against the trial court’s ruling, and that the notes
were considered during deliberations. 
Appellant’s counsel testified by affidavit that appellant’s second chair
defense counsel had reported to him that, during a post-verdict conversation,
an unnamed juror had reported that another juror had taken notes during
deliberations and shared them with the other jurors during deliberations and
that one of the notes referred to one of appellant’s expert witnesses as “Dr.
Sleazeball.”   The affidavit further
stated that neither he, nor his second chair, nor his legal assistant observed
any juror taking notes and therefore he did not request a mistrial during
trial.  Attorneys for both the defense
and the State testified by affidavit that they did not see jurors taking notes.  The prosecutors also swore in their affidavits
that the juror who indicated that another juror had taken notes did not specify
whether the notes were made during deliberations or during trial.  Although the record contains an agreed
hearing setting for the motion, signed by the court, no hearing was held on the
motion; instead the agreed motion contains the statement “off-docket,”
apparently written by the court.  The
trial court did not rule on the motion, and it was overruled by operation of
law.  

In reviewing a motion for a new
trial, the trial court may receive evidence by affidavit.  Tex.
R. App. P. 21.7.  The trial court
is not required to believe the factual statements made in an affidavit, even
when these are uncontradicted by other affidavits.  Charles
v. State, 146 S.W.3d 204, 213 (Tex. Crim. App. 2004); Shanklin v. State, 190 S.W.3d 154, 167 (Tex. App.—Houston [1st
Dist.] 2005), pet. dism’d,
improvidently granted, 211 S.W.3d 315, 316 (Tex. Crim. App. 2007).  In considering a motion for new trial, the
reviewing court must give deferential review to the trial court’s determination
of historical facts based upon affidavits. 
Manzi v. State, 88 S.W.3d 240,
241 (Tex. Crim. App. 2002).  

Appellate courts generally review a
trial court’s ruling on a motion for a new trial under an abuse of discretion
standard.  Holden v. State, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). When
there are no written findings in the record, we view the evidence in the light
most favorable to the trial court’s ruling on any theory of law applicable in
the case.  Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).  An appellate court must defer to the trial
court’s ruling to the extent that any reasonable view of the record supports
the ruling.  Holden, 201 S.W.3d at 763 (holding that appellate courts review
ruling on motion for new trial to determine whether trial court’s decision was
arbitrary or unreasonable).   

          Here,
both the defense and the State filed affidavits.  The trial court was free to refuse to
consider the statements of juror misconduct in defense counsel’s affidavit as
hearsay and to believe the affidavits of the defense and the prosecution that
they did not witness juror misconduct in considering whether to grant
appellant’s motion for a new trial.  See Charles 146 S.W.3d at 213.  

We overrule appellant’s third
issue.

PHOTO ARRAY

          In
his fifth issue, appellant contends that the trial court erred by admitting an
impermissibly suggestive photo array that had been shown to Ibarra and Urbina
and in allowing their improper in-court identifications of appellant.    

Appellant contends that the photo
array was impermissibly suggestive because the complainant’s brother and widow
were present when it was viewed and their presence “injected a heavy incentive
for the witnesses to make a mistaken identification.”  Appellant argues that the use of the
deceased’s brother as a translator, the presence of his widow, and the fact
that Officer Miller did not show the witnesses the photo array at the police
station provided strong incentives for misrepresentation.  Appellant also contends that his picture in
the photo array did not resemble him at the time of the murder because the
photo was from 2003 and did not include his facial tattoos.    

Before trial, appellant filed a
“motion to suppress photographic identification.”  At trial, the trial court held three hearings
on appellant’s motion to suppress the photographic identification.  The first hearing was conducted prior to
empanelling the jury, and Officer M. Miller testified.  In the second hearing, conducted outside the
presence of the jury, Ibarra testified. 
In the last hearing, also conducted outside of the presence of the jury,
Urbina testified.  

          Officer
Miller testified in the first hearing that he had a photo array developed that
included a picture of appellant and five other people whose physical features
resembled those of appellant.  The photo
array, labeled State’s Exhibit 49, comprises headshots of appellant and five
other males.  All of the photos are of
white men of approximately the same age with closely cropped or shaved hair,
similar complexions, small amounts of facial hair, and closed mouths.  

On July 5, 2007, Officer Miller
contacted Leroy Rios to obtain Ibarra’s home address.  Although he tried to obtain a translator to
accompany him to Ibarra’s house, he was unable to do so, and so he asked Leroy
Rios to translate for him.  When they
arrived at Ibarra’s home, the complainant’s widow, Marahi Rios, was there and
remained present throughout the showing of the photo array.  Officer Miller admonished Ibarra and then
presented the array to her.  He testified
that she positively identified appellant. 
He testified that he then went to Urbina’s house and that Leroy and Marahi
Rios followed in a separate car.  After
admonishing Urbina, through Leroy Rios, Officer Miller presented her with the
photo array and she positively identified appellant.    

          Ibarra
testified in the second hearing on the motion to quash that, on the night of
the complainant’s murder, she was working at his nightclub as a cashier and a
bartender.  She testified that the
majority of her customers were Hispanic, but on the night of the complainant’s
murder she observed a white man and an African-American man enter the bar, have
a few beers, and play pool.  To her,
these men were conspicuous because they were not Hispanic.  She testified that Officer Miller called her
on July 5, 2007, and asked whether he could show her some photographs.  She consented.  After Officer Miller arrived at her house, he
admonished her, with Leroy Rios translating, that the photo array might not
include the suspect.  She testified that
while she was looking at the photo array, Officer Miller was silent.  She looked at the photo array and identified
appellant as the person who committed the murder.  

During this hearing, and at the
instruction of the trial court, appellant did not face Ibarra, and instead
faced the courtroom’s back wall.  After
Ibarra identified appellant in the photo array for the court, the trial court
instructed appellant to face Ibarra, and she identified him as the man she saw
in the bar on the night of Rios’s murder. 
The trial court then ruled that Ibarra could testify to appellant’s
identity in front of the jury and that she would be allowed to identify him in
court in front of the jury.  Lastly, the
trial court made a finding that Ibarra and Officer Miller presented credible
testimony.    

In the third hearing, Urbina
testified that, on the night of the complainant’s murder, she was working at
the nightclub, in the trailer that sold tacos outside of the bar’s front
door.  She saw an “American” and an
African-American enter and leave the bar several times.  She testified that she could see them clearly
and that at one point appellant was only a foot away from her.  Approximately three weeks after the murder,
Officer Miller came to her house and, through Leroy Rios, asked her to look at
a photo array and determine whether the man she saw at the nightclub was in
it.  She identified appellant in the photo
array.  She testified that she had not
spoken with Ibarra before she looked at the photos and that she did not feel
pressured to select a photo.  The trial
court acknowledged that it did not consider “it wise for any family members of
a complainant to be present or do a translation on identification,” but it
found the identification testimony admissible. 
It denied appellant’s motion to suppress and allowed Ibarra and Urbina
to identify appellant in court.

A.              
Standard of Review

In reviewing a trial court’s
decision on the admissibility of a pretrial identification, we defer to the
trial court’s rulings on mixed questions of law and fact if they turn on the
credibility and demeanor of witnesses.
See Loserth v. State, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). We review
de novo mixed questions of fact and law that do not turn on an evaluation of
credibility and demeanor. Id. The
question of whether a pretrial identification procedure was impermissibly
suggestive is a mixed question of law and fact that does not turn on an
evaluation of credibility and demeanor. See
id. at 773. Accordingly, we apply a de novo standard of review. Id. 


Appellate courts are not limited to
reviewing only the evidence adduced at the admissibility hearing when
considering the identification. Webb v.
State, 760 S.W.2d 263, 272 n.13 (Tex. Crim. App. 1988). An appellate court
may review both the hearing testimony and evidence adduced at trial when
determining the admissibility of a pre-trial identification. Id.  A
pretrial identification procedure may, however, be so suggestive and conducive
to mistaken identification that subsequent use of that identification at trial
would deny the accused due process of law. See
Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); Barley v. State, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). 

When challenging the admissibility
of a pretrial identification, an accused has the burden to show: (1) the
out-of-court identification procedure was impermissibly suggestive, and (2) the
suggestive procedure gave rise to a substantial likelihood of irreparable
misidentification. Barley, 906 S.W.2d
at 33. If a court finds that a pretrial identification procedure was
impermissibly suggestive, it must then consider whether the suggestive
procedure gave rise to a substantial likelihood of irreparable
misidentification. Neil v. Biggers,
409 U.S. 188, 199, 93 S. Ct. 375, 381–82 (1972). A defendant bears the burden of establishing by clear and
convincing evidence that the pretrial identification procedure was
impermissibly suggestive. Barley, 906
S.W.2d at 33–34.  The factors used to determine whether an
impermissibly suggestive identification procedure gives rise to a substantial
likelihood of irreparable misidentification are treated as historical issues of
fact and are viewed in the light most favorable to the trial court.  Loserth,
936 S.W.2d at 773–74.

In determining the impermissible
suggestiveness prong of the Barley test,
we review the procedure to determine whether suggestiveness was created by the
manner in which the pretrial identification procedure was conducted.  Id.
at 33.  For example, a police officer may
point out the suspect or suggest that a suspect is included in a line-up or
photographic array.  Id.  The content of a line-up
or photographic array itself may be suggestive if the suspect is the only
individual who closely resembles the description given by the witness.  Id.  Furthermore, an individual procedure may be
suggestive or the cumulative effect of procedures may be suggestive. Id.

If it is determined that the
pre-trial identification procedure was impermissibly suggestive, we determine
whether the procedure created a “substantial likelihood of irreparable
misidentification.”  Id. at 34.  “The test is whether,
considering the totality of the circumstances, ‘the photographic identification
procedure was so impermissibly suggestive as to give rise to a very substantial
likelihood of irreparable misidentification.’” 
Ibarra v. State, 11 S.W.3d
189, 195 (Tex. Crim. App. 1999) (quoting Simmons,
390 U.S. at 384, 88 S. Ct. at 971). 
Ultimately, “reliability is the linchpin in determining the
admissibility of identification testimony.” Id.


In Luna v. State, the Court of Criminal Appeals held that “[t]he
following five non-exclusive factors should be weighed against the corrupting
effect of an suggestive identification procedure in assessing reliability under
the totality of the circumstances: (1) the opportunity of the witnesses to view
the criminal at the time of the crime; (2) the witnesses degree of attention;
(3) the accuracy of the witnesses’ prior description of the criminal; (4) the
level of certainty demonstrated by the witnesses at the confrontation, and (5)
the length of time between the crime and the confrontation.  Luna v.
State, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing Ibarra, 11 S.W.3d at 195).

B.              
Analysis

While appellant urges this Court to
find that the procedure created an impermissibly suggestive identification, he
acknowledges that, “[t]here is no statute or case law which prohibits the use
of grieving family members to translate during photo array presentations . . .
Nor are there statutes or case law which prohibit the grieving widow [from
being] present during the identification procedure.”  We conclude that appellant has failed to
prove the first prong of the Barley
test, an impermissibly suggestive identification procedure.  See
Barley, 906 S.W.2d at 33.  Nevertheless, even if appellant had
established that Detective Miller’s using the complainant’s brother as a
translator and allowing the complainant’s widow to be present at the showing of
the photo array created an impermissibly suggestive procedure, he would still
not have shown that the procedure gave rise to a substantial likelihood of
irreparable misidentification, establishing the second prong of the Barley test.  See id.  

In determining whether an appellant
has proved a substantial likelihood of irreparable misidentification, we
consider the facts of the case in the context of the five Biggers factors.  Luna, 268 S.W.3d at 605.  

Here, the witnesses had an ample
opportunity to view the killer at the time of the crime.  See
Luna, 268 S.W.3d at 605.  Both Ibarra
and Urbina testified that appellant was conspicuous because he was among the
only non-Hispanic patrons in the bar. 
Further, Ibarra testified that she observed him intermittently over a
period of four hours and Urbina testified that appellant came within a foot of
her and that good lighting made it easy for her to see him.  Second, both witnesses testified that because
appellant was conspicuous to them they paid particular attention to him.  Third, while the descriptions of appellant
varied slightly and appellant’s acquaintance Adams, Detective Miller, and
appellant’s mother-in-law all testified that appellant had altered his appearance
for trial by adding tattoos and as much as sixty pounds of weight, the
descriptions provided by both witnesses generally conformed to appellant’s
physical features.  Fourth, both
witnesses were confident in their identification of appellant, and the trial
court entered findings that Ibarra was credible.  In addition, Urbina had viewed a prior photo
array that did not contain appellant’s photo and was unable to identify anyone
in it as the shooter.  Finally, there was
less than a month between the murder and the identification.  Id.

Appellant contends only that the
photo in the array was from 2003 and was misleading because it did not include
his facial tattoos.  However, appellant
does not direct us to any evidence that appellant had facial tattoos or different
tattoos on the night of the killing.[4]  Nor does he provide any authority supporting
his claim that the presence or absence of tattoos renders a photo array
unreliable.  

          We
conclude that appellant has not shown that the photographic identification
procedure was impermissibly suggestive or gave rise to a substantial likelihood
of irreparable misidentification. 
Therefore, we hold that the trial court did not abuse its discretion in
allowing Urbina and Ibarra to testify to appellant’s identity.  See Id.

          We
overrule appellant’s fifth issue.

ADMISSION OF HEARSAY STATEMENTS

          In
his sixth issue on appeal, appellant contends that the trial court erred in
admitting the hearsay statement of Carolee Procter during the State’s direct
examination of Detective Miller.

          A
trial court’s ruling on the admissibility of evidence is reviewed for an abuse
of discretion.  See Coffin v. State, 885 S.W.2d 140, 149 (Tex. Crim. App.
1994).  An appellate court should not
reverse a trial court whose ruling was within the “zone of reasonable
disagreement.”  Green v. State, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996).  The reviewing court must review the evidence
in the light most favorable to the trial court’s ruling, giving the trial court
almost total deference on its findings of historical fact that are supported by
the record.  Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  However, to preserve an issue for appeal, the
complaining party must object and either obtain an adverse ruling on the record
or object to the trial court’s refusal to rule on the objection.  Tex.
R. App. P. 33.1(a); Thierry v.
State, 288 S.W.3d 80, 85 (Tex. App.—Houston [1st Dist.] 2009, pet.
ref’d).  An “off-the-record” objection
will not preserve a complaint for appeal. 
Lasher v. State, 202 S.W.3d
292, 295 (Tex. App.—Waco 2006, pet. ref’d).

          Appellant
contends that Detective Miller testified over a running objection to hearsay
statements of appellant’s wife, Carolee Proctor.  Specifically, appellant directs us to the
following exchange:

[State]:                 What question, if anything,
[did] you ask  [appellant’s wife]?

 

[Miller]:                Well, immediately, we were
looking for a white male suspect and when a black female opened door [sic], we
had to first clear that up, whether or not there was a white male that lived at
this residence. So my partner asked her a question, Is there a white male that
lives at this residence?

 

[Defense]:             Objection to any hearsay, Your
Honor.

 

[Trial
Court]:        May I see the attorneys up
here.  

 

                             (Off record
discussion held at bench.)

 

[State]:                 I think where we left off,
y’all asked the question: Does a white male live here?

 

                             And the response
was?

 

[Miller]:                No, there is not.

 

. . . .

 

[State]:                 Where are you standing when she
walked into the bathroom?

 

[Miller]:                Standing in the living room.

 

[State]:                 What, if anything, did you
notice?

 

[Miller]:                On top of the VCR in the living
room was a picture of a black female, appeared to be the person we were talking
to, Carolee Proctor, embraced in a hug with the defendant.

 

[State]:                 Now, before she left to change
clothes, did she convey to you who she was living there with, or did she simply
say—

 

[Defense]:             Your Honor, I would ask for the
continuing objection, same subject.

 

[Court]:
               You may have that, same
ruling.

 

Detective Miller subsequently testified to matters
that appellant’s wife had told him.  For
example, he testified, “We asked her about the picture and the white male that
was in the picture.”  The State then
asked, “At that point, what if anything, did she acknowledge?”  Detective Miller answered, “She told us it
was her husband.”  We conclude that that
appellant preserved this issue for appeal by obtaining a running objection from
the trial court.  

          Assuming
without deciding that the trial court erred in admitting hearsay evidence over
a running objection, we conclude that the error was harmless.  See
Tex. R. App. P. 44.2(b)
(providing that a non-constitutional “error, defect, irregularity, or variance
that does not affect substantial rights must be disregarded.”).  The Court of Criminal Appeals has held that
“substantial rights are not affected by the erroneous admission of evidence ‘if
the appellate court, after examining the record as a whole, has fair assurance
that the error did not influence the jury, or had but slight effect.’”  Motilla
v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting Soloman v. State, 49 S.W.3d 356, 365
(Tex. Crim. App. 2001)).  “In assessing
the likelihood that the jury’s decision was adversely affected by the error,
the appellate court should consider everything in the record including any
testimony of physical evidence . . . , the nature of the evidence supporting
the verdict, the character of the alleged error and how it might be considered
in connection with other evidence in the case.” 
Motilla, 78 S.W.3d at 355. 

In this case, the weight of the
evidence against appellant was overwhelming. 
Ibarra and Urbina had time to observe appellant over a substantial
period of time on the night of the murder and identified him both in a photo
array and in court.  Appellant himself
confirmed his address and relationship with his wife by telephoning the police
within fifteen minutes after the detectives left his home to report that he was
in Louisiana.  Through the use of his
cell phone records and his statements to the police officers, the jury could
reasonably have concluded that appellant lied about where he was on the night
of the murder.  Additionally, appellant
admitted to Adams that he committed the killing. When we consider the nature of
any error in admitting hearsay in comparison to the other evidence in the case,
the likelihood that the jury’s decision was adversely affected by the error is
small.  Therefore, even if the trial court
erred in admitting hearsay evidence over a running objection the error was
harmless.  

We overrule appellant’s sixth
issue.

INEFFECTIVE ASSISTANCE OF COUNSEL

In his seventh issue, appellant
contends that he received ineffective assistance of counsel because his counsel
failed to cross examine his acquaintance Joseph Adams, who testified that while
they were incarcerated together, appellant confessed to the crime and also
sought to get tattoos to alter his appearance. 


 

A.              
Standard of Review

To prevail on a claim of
ineffective assistance of counsel, an appellant must show that his trial
counsel’s performance was deficient and that a reasonable probability exists
that, but for the deficiency, the result of the proceeding would have been
different.  Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S. Ct. 2052,
2064, 2068 (1984).  The first prong of
the Strickland test requires that the
defendant show that counsel’s performance fell below an objective standard of
reasonableness.  Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). This
does not require a showing that counsel’s representation was without
error.  See Ex parte Duffy, 607 S.W.2d 507, 514 (Tex. Crim. App. 1980), overruled on other grounds, Hernandez v.
State, 988 S.W.2d 770 (Tex. Crim. App. 1999).  Isolated errors do not render counsel’s
performance ineffective.  See McFarland v. State, 845 S.W.2d 824,
843 (Tex. Crim. App. 1992), overruled on
other grounds, Bingham v. State,
915 S.W.2d 9 (Tex. Crim. App. 1994).  The
second prong requires the defendant to show a reasonable probability that, but
for his counsel’s unprofessional errors, the result of the proceeding would
have been different.  See Strickland, 466 U.S. at 694, 104 S.
Ct. at 2068; Thompson, 9 S.W.3d at
812.  Because the reviewing court must,
however, indulge a strong presumption that counsel’s conduct falls within the
wide range of reasonable professional assistance, the defendant must overcome
the presumption that, under the circumstances, the challenged action “might be
considered sound trial strategy.”  Strickland, 466 U.S. at 689, 104 S. Ct.
at 2065.

Any allegation of ineffectiveness
must be firmly founded in the record, which must affirmatively demonstrate the
alleged ineffectiveness.  Thompson, 9 S.W.3d at 813 (citing McFarland, 928 S.W.2d at 500).  We will not speculate to find trial counsel
ineffective when the record is silent on counsel’s reasoning or strategy.  See
Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.—Houston [1st Dist.] 1996, no
pet.).  In rare cases, however, the
record can be sufficient to prove that counsel’s performance was deficient,
despite the absence of affirmative evidence of counsel’s reasoning or strategy.  See
Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000).  Such cases are limited to occasions where no
reasonable attorney could have made such a decision.  Weaver
v. State, 265 S.W.3d 523, 538 (Tex. App.—Houston [1st Dist.] 2008, pet. ref’d).

When an appellant does not file a
motion for new trial asserting ineffective assistance of counsel that would
have afforded trial counsel an opportunity to explain his strategy and no
direct evidence in the record establishes why appellant’s attorney acted as he
did, we presume that counsel had a plausible reason for his actions.  See
Thompson, 9 S.W.3d at 814.  We review
the record to determine whether this is one of those rare cases where no
reasonable attorney could have made the decisions complained of in this
appeal.  See id.

B.              
Analysis

Appellant contends that his trial
counsel was deficient for failing to cross examine Adams.  However, appellant has failed to show that
counsel did not have a strategic or reasoned basis for not examining Adams.  Jackson,
877 S.W.2d at 771.  Appellant’s counsel
cross-examined all of the State’s other witnesses with the exception of Dr.
Chu, a medical examiner from Harris County. 
We cannot speculate as to counsel’s reasoning and we cannot say that no
reasonable attorney would have not cross-examined Adams.  Miniel
v. State, 831 S.W.2d 310, 324 (Tex. Crim. App. 1992) (stating that decision
of whether to cross-examine and which questions to ask falls within parameters
of trial strategy).

Moreover, even if we had found that
counsel’s actions were deficient, appellant has not shown that but for his
counsel’s decision not to cross-examine Adams the result of the trial would
have been different.  Appellant merely
argues that “[t]his failure to cross-examine a key State witness, particularly
about his prior convictions, recall of events, and consideration received for
his testimony is urged to be found to be ineffective assistance of
counsel.”  However, appellant does not
direct us to any information that could have come out during a
cross-examination of Adams that would have changed the result of the
trial.  Consequently, had we determined
that trial counsel erred in failing to cross-examine Adams, we would have
concluded that appellant failed to establish prejudice.  See
Thompson, 9 S.W.3d at 807.

Therefore, we overrule appellant’s
seventh issue.

CONCLUSION

We affirm the judgment of the trial
court.

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Hanks, and Higley.

Publish
in part; do not publish.   Tex. R.
App. P. 47.

 











[1]
              See Tex. Penal Code Ann. § 19.03(a) (Vernon 2003) (providing elements for
capital murder).





[2]
              On
cross-examination, she testified that she also provided other identifying
characteristics of appellant, such as a cleft chin and a pointed nose, that
differed slightly from appellant’s actual physical appearance.  





[3]
          Appellant also contends that the
trial court erred in not ruling on his motion, but in its ruling the trial
court specifically stated, “I am denying your request for the information.” 

 





[4]
              State’s
Exhibit 53, which is a photograph of appellant when he was arrested, apparently
shows no facial tattoos.  Detective
Miller testified that, while appellant had a mark under his right eye, he did
not have a tattoo there when he was photographed following his arrest.